UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ROBERT McFADDEN,

                              Plaintiff,                                    REPORT
                                                                              and
                    v.                                              RECOMMENDATION

LYNN CONNERS,                                                  19-CV-766-JLS-LGF
DONALD BEECROFT,
JOSEPH NOETH,
ANDREW RAPINI,
D. CRANE, and
OFFICER NORDIN,

                              Defendants.
_____

APPEARANCES:        PHILLIPS LYTLE LLP BUFFALO
                    Attorneys for Plaintiff
                    ERIN C. BOREK, and
                    MARK F. PINCELLI, of Counsel
                    One Canalside
                    125 Main Street
                    Buffalo New York  14203-2887

                    LETITIA A. JAMES
                    ATTORNEY GENERAL, STATE OF NEW YORK
                    Attorney for Defendants
                    STEPHANIE JOY CALHOUN
                    Assistant Attorney General, of Counsel
                    Main Place Tower
                    Suite 300A
                    350 Main Street
                    Buffalo, New York  14202


## JURISDICTION

        This case was referred to the undersigned by Honorable Lawrence J. Vilardo on

February 12, 2020, for all pretrial matters including preparation of a report and

recommendation on dispositive motions. (Dkt. 29)  The matter is presently before the

court on motions for summary judgment filed on August 30, 2024, by Plaintiff (Dkt. 87),

and Defendants (Dkt. 88).

## BACKGROUND

On June 10, 2019, Plaintiff Robert McFadden ("Plaintiff"), an inmate in the

custody of New York State Department of Corrections and Community Supervision

("DOCCS"), commenced this civil rights action pursuant to 42 U.S.C § 1983 alleging

that while housed at Attica Correctional Facility ("Attica" or "the correctional facility"),

Defendants, all DOCCS's employees then working at Attica, violated Plaintiff's Eighth

Amendment rights and New York common law by serving Plaintiff meals that did not

comply with Plaintiff's medically restricted diet causing Plaintiff to become physically ill

and to sometimes skip meals or food items.  Defendants to this action include Attica's

Food Service Administrators Lynn Conners ("Conners"), and Donald Beecroft

("Beecroft"), Attica Superintendent Joesph Noeth ("Noeth"), and corrections officers

Andrew Rapini ("Rapini"), D. Crane ("Crane"), and Norton ("Norton")[1] (together,

"Defendants").  Plaintiff's original Complaint was dismissed on August 30, 2021 by

Order of District Judge John L. Sinatra, Jr. (Dkt 36) (adopting undersigned's Report and

Recommendation filed August 2, 2021 (Dkt. 35), recommending granting Defendants'

amended motion to dismiss (Dkt. 28), but granting Plaintiff leave to file amended

complaint).

On September 13, 2021, Plaintiff filed a motion seeking appointment of counsel

(Dkt. 37), which the court granted on September 17, 2021 (Dkt. 38), with Erin C. Borek,

---

[1] Defendant Norton's name is incorrectly spelled in the Amended Complaint and in various other part of the record as "Nordin."

Esq., appointed to represent Plaintiff in this matter, *pro bono*. (Dkt. 42).[2] In a Decision and Order filed August 3, 2022 (Dkt. 52), the court granted in part and denied in part Plaintiff's motion filed January 24, 2022 for leave to file an amended complaint (Dkt. 45), and Plaintiff was directed to file an amended complaint within 30 days. Accordingly, on August 17, 2022, Plaintiff filed an amended complaint (Dkt. 53) ("Amended Complaint"), to which Defendants, on October 3, 2022, filed their answer (Dkt. 56). Discovery ensued and concluded on December 29, 2023.

On August 30, 2024, Plaintiff and Defendants filed their respective motions for summary judgment, Dkt. 87 ("Plaintiff's motion"), and Dkt. 88 ("Defendants' motion"). Plaintiff's motion is supported by the attached Declaration of Mark F. Pincelli[, Esq.][3] (Dkt. 87-1) ("Pincelli Declaration"), with exhibits A through AA (Dkts. 87-2 through 87-28) ("Plaintiff's Exh(s). __"), Plaintiff's Statement of Undisputed Material Facts (Dkt. 87-29) ("Plaintiff's Statement of Facts"), and Plaintiff's Memorandum in Support of Motion for Summary Judgment (Dkt. 87-30) ("Plaintiff's Memorandum"). Defendants' motion is supported by the attached Memorandum of Law in Support of Defendants' Motion for Summary Judgment (Dkt. 88-1), the Statement of Undisputed Facts (Dkt. 88-2) ("Defendants' Statement of Facts"), and the Declarations of [Assistant Attorney General] Stephanie Joy Calhoun (Dkt. 88-3) ("Calhoun Declaration"), Donald Beecroft (Dkt. 88-4) ("Beecroft Declaration"), Lynn Conners (Dkt. 88-5) ("Conners Declaration"), Darren J. Crane (Dkt. 88-6) ("Crane Declaration"), Joseph Noeth (Dkt. 88-7) ("Noeth

---

[2] The court notes that although not appointed as *pro bono* counsel, on January 24, 2022, Mark F. Pincelli, Esq. filed a notice of appearance of behalf of McFadden. (Dkt. 44).

[3] Unless otherwise indicated, bracketed material has been added.

Declaration"), Christopher Norton (Dkt. 88-8) ("Norton Declaration"), and Andrew Rapini (Dkt. 88-9) ("Rapini Declaration").

In response to Defendants' motion, Plaintiff filed on October 4, 2024, the Declaration of Mark F. Pincelli[, Esq.] (Dkt. 92) ("Pincelli Response Declaration"), attaching exhibits A through X (Dkts. 92-1 through 92-24) ("Plaintiff's Response Exh(s). __"); Plaintiff's Opposition Statement of Undisputed Material Facts (Dkt. 92-25) ("Plaintiff's Opposing Statement of Facts"), and Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Dkt. 92-26) ("Plaintiff's Response").  In response to Plaintiff's motion, Defendants filed on October 4, 2024, Defendants' Memorandum of Law in Opposition to and in Response to Plaintiff's Motion for Summary Judgment (Dkt. 93) ("Defendants' Response"), and Defendants' Response to Plaintiff's Statement of Undisputed Facts (Dkt. 93-1) ("Defendants' Opposing Statement of Facts").  On October 18, 2024, Plaintiff filed Plaintiff's Reply Memorandum of Law in Further Support of His Motion for Summary Judgment (Dkt. 94) ("Plaintiff's Reply"), and Defendants filed the Reply Memorandum of Law in Further Support of Defendants' Summary Judgment Motion (Dkt. 95) ("Defendants' Reply"), attaching the Declaration of [Assistant Attorney General] Stephanie Joy Calhoun (Dkt. 95-1) ("Calhoun Reply Declaration."  Oral argument was deemed unnecessary.

Based on the following, Plaintiff's motion should be DENIED; Defendants' motion should be GRANTED with regard to Defendants Beecroft, Conners, and Noeth, and DENIED as to Defendants Crane, Norton, and Rapini against whom the action should proceed to trial.

## FACTS[4]

At all times relevant to this action, Plaintiff Robert McFadden ("Plaintiff" or "McFadden"), was an inmate in the custody of DOCCS.  On June 8, 2016, Plaintiff, then incarcerated at Southport Correctional Facility ("Southport"), based on medical laboratory testing, was diagnosed with allergies to wheat and bananas ("allergens").[5] Plaintiff's Exh. J (Dkt. 87-11).  Based on this diagnosis, on June 13, 2016, Plaintiff was provided at Southport with a "therapeutic diet" that excluded any food items containing wheat or bananas, or cross-contaminated food items, *i.e.*, food that came into contact with one of Plaintiff's allergens.[6]  A DOCCS Health Services System Request and Report of Consultation dated September 2, 2016, Plaintiff's Exh. K (Dkt. 87-12) ("Consultation Report"), indicates Plaintiff, while incarcerated at Southport, lost 70 lbs.[7]

On November 28, 2016, Plaintiff was transferred from Southport to Attica where Plaintiff was assigned to the Special Housing Unit ("SHU"), and on November 29, 2016, a request for Plaintiff to be fed at Attica a therapeutic diet based on wheat and banana allergies was approved.  Plaintiff's Exh. N (Dkt. 87-15).  An Attica Food Service Department Memorandum dated November 29, 2016, advises Plaintiff that Attica's

---

[4] Taken from the pleadings and motion papers filed in this action.

[5] Plaintiff alleges he was also diagnosed with an allergy to peanuts, Amended Complaint ¶ 14; Plaintiff's Statement of Facts No. 5, but nothing in the record substantiates that allegation.  Defendant Conners, however, stated that no peanuts or nuts of any kind are used in any meals prepared in by Attica's Food Service, Conners Dep. Tr. (Dkt. 87-5) at 81, rendering whether Plaintiff is, in fact, allergic to peanuts irrelevant.

[6] Plaintiff's "wheat allergy" is also referred to as a "gluten intolerance" although it is not clear they are the same.  *See* Connors Dep. Tr. (Dkt. 87-5) at 110-11 (not certain a "gluten-free diet" is intended to accommodate an allergy to wheat).  It nevertheless is undisputed that Plaintiff's therapeutic diet included "gluten free" and wheat free foods.

[7] The consultation report does not indicate the period of time over which Plaintiff lost 70 lbs. nor the cause of the weight loss.

Food Service Department ("Food Service" or "mess hall") would provide Plaintiff, who was to receive meals "feed in cell,"[8] with the therapeutic diet beginning with breakfast on November 30, 2016. Plaintiff's Exh. O (Dkt. 87-16). Defendant Conners, Attica's Deputy Food Service Administrator, maintains that he was directed by DOCCS's regional coordinator to provide Plaintiff with a therapeutic diet that was both gluten-free and without any bananas. Conners Dep. Tr. [9] at 111.

In addition to food served to the general prison population at Attica, so-called "special diets" are available for those inmates with particular religious or medical requirements. Medical requirements include, *inter alia*, food allergies, low sodium diets, and low fat diets, all which are often referred to as "therapeutic diets." DOCCS maintains a therapeutic diet policy set forth in DOCCS Directive 4311 and DOCCS Therapeutic Diet Manual. *See* Plaintiff's Dep. Tr.[10] at 46. Therapeutic diet requests for inmates are provided by the correctional facility's medical staff to Attica's Food Service. Beecroft Dep. Tr.[11] at 42-43. Attica has two mess halls, but food is prepared in only one of the mess halls. *Id*. at 45. The food for all inmates, including those in the general prison population and in SHU, is prepared by Food Service workers which include civilian staff as well as inmates. *Id*. at 45-46, 52-53. Cooks and head cooks oversee

---

[8] Because Plaintiff was then housed in SHU, Plaintiff received his meals "feed in cell" with a correctional officer providing Plaintiff's food tray to Plaintiff in his cell, rather than Plaintiff receiving his meal with the general prison population in Attica's cafeteria.

[9] References to "Conners Dep. Tr." are to the pages of the transcript of Conners's November 6, 2023 deposition, filed in full as Plaintiff's Exh. D (Dkt. 87-5), and in portions by Defendants as Conners Declaration Exh. B (Dkt. 88-5 at 36-58).

[10] References to "Plaintiff's Dep. Tr." are to the pages of the transcript of Plaintiff's June 12, 2023 deposition, filed as Plaintiff's Exh. C (Dkt. 87-4).

[11] References to "Beecroft Dep. Tr." are to the pages of Beecroft's November 9, 2023 deposition, filed in full by Plaintiff (Dkt. 87-9), and in portions as Beecroft Declaration Exh. B (Dkt. 88-4 at 18-55).

all food preparation.  *Id*. at 47.  Food trays for those inmates on special diets are

prepared in the diet area of the mess hall, *id*., and are labeled with stickers.  *Id*. at 50.

Each special diet food tray is checked for accuracy by a head cook who then marks the

tray before it leaves the food prep area.  *Id*. at 48-49, 51, 103.

      Whereas food for inmates in SHU who are not on special diets is prepared in the

mess hall and then transported in bulk to SHU where the porters portion the food onto

food trays that are then delivered to the inmates in their cells, the therapeutic diet meals

for SHU inmates are prepared in the mess hall and wrapped in cellophane to avoid

cross contamination.  Each therapeutic diet request identifies the inmate who is to

receive the diet by the inmate's identification number and housing location which is

written on the foods trays which are made of disposable Styrofoam.  Based on the

packaging and writing on the food trays, the correction officers ("C.O.s" or "officers") are

able to determine that a specific food tray contains foods for a diet other than that

served to the general prison population, although the C.O.s do not know the specific

diet such as whether for a medical or religious purpose.  Before handing the therapeutic

diet food trays to those inmates receiving therapeutic diets, the C.O.s delivering such

trays remove the cellophane wrapping and inspect the trays.  If an inmate who is

approved for a therapeutic diet receives a food tray with incorrect food items, the inmate

is to notify the C.O. who is then to inspect the tray to corroborate the inmate's

complaint.  Noeth Dep. Tr. at 42.  Upon verifying the inmate's complaint regarding the

incorrect food items, the C.O. is required to contact either the hall captain or the mess

hall and have a replacement tray sent to the inmate.  *Id*. at 42-43.  In SHU, after the

allotted dining time expires, officers go from cell to cell with a trash can, collecting the

used Styrofoam trays and all attendant dining accessories including cups, and sporks, which are then deposited into the trash can.

In a letter to Attica's Food Services Administrator ("FSA") dated November 30, 2016, ("November 30, 2016 letter"),[12] Plaintiff alerted the FSA that he had not received food consistent with his diet restrictions since arriving at Attica on November 28, 2016. Plaintiff specifically advised that upon his arrival on Monday, November 28, 2016,[13] Plaintiff had only an apple for dinner. The next day, Tuesday, November 29, 2016, Plaintiff was given bread at each meal and pasta for lunch. For breakfast on Wednesday, November 30, 2016, Plaintiff was only given bread and rice cakes. Also on November 30, 2016, Plaintiff filed Inmate Grievance No. 67830-16 ("first grievance")[14] with Attica's Inmate Grievance Resolution Committee ("IGRC"), advising that despite being approved for a therapeutic diet, for breakfast on November 30, 2016, Plaintiff was given a tray of food ("food tray" or "tray") that was missing some items and had other items that were inconsistent with Plaintiff's therapeutic diet. When Plaintiff complained to the C.O.s in SHU that the food items on the tray, specifically the wheat bread, did not comply with Plaintiff's therapeutic diet, the C.O.s did not take any corrective action to have Plaintiff's tray replaced with a proper food tray, *i.e.*, a food tray containing food items consistent with Plaintiff's therapeutic diet, and one of the officers

---

[12] Plaintiff's Exh. P (Dkt. 87-17).

[13] Plaintiff provides only the days of the week, rather than the specific dates of which the court takes judicial notice based on a 2016 calendar. *See Flannery v. Cnty. of Niagara*, 2025 WL 659389, at *33 (W.D.N.Y. Jan. 31, 2025) ("The court may take judicial notice of facts established by a calendar, as the accuracy of a calendar cannot be reasonably questioned." (citing *Edwards v. Berryhill*, 2019 WL 2340953, at *4 n.10 (W.D.N.Y. June 3, 2019) (taking judicial notice of fact established by calendar), and *Nassry v. St. Luke's Roosevelt Hosp.*, 2016 WL 1274576, at *13 n.8 (S.D.N.Y. Mar. 31, 2016) (same))).

[14] Plaintiff's Exh. Q (Dkt. 87-18).

told Plaintiff that Plaintiff was given the tray that was sent by Food Service. Plaintiff's request that the correction officer call the mess hall and request replacement food items for the non-compliant items was ignored. On December 5, 2016, receipt of Plaintiff's first grievance was acknowledged by Attica's Grievance Clerk, Plaintiff's Exh. R (Dkt. 87-19), and Defendant Beecroft, then Attica's Food Service Administrator, issued to Plaintiff an Attica Food Service Memorandum advising that Plaintiff's "concerns for a Gluten-free diet have been noted and properly addressed," adding that "[a] Therapeutic Gluten-free menu may be obtained through a F.O.I.L request." Plaintiff's Exh. S (Dkt. 87-20).

In a letter to Defendant Noeth dated December 19, 2016 ("December 19, 2016 letter"),[15] Plaintiff memorialized a conversation Plaintiff had earlier that day with Noeth regarding two letters and two inmate grievances Plaintiff filed concerning continuing issues with his therapeutic diet, including that every day he was provided with food items he could not eat and requesting Defendant Noeth have someone train Attica's Food Service workers what foods should be included for Plaintiff's therapeutic diet. Plaintiff also asserted in the December 19, 2016 letter that he discussed his issues with his food trays with his mental health counselor and the correction officers who distributed the food trays, *i.e.*, "feed-up officers," but no corrective action was taken. On December 22, 2016, Defendant Noeth received Plaintiff's December 19, 2016 letter on which Noeth handwrote a notation that Attica's Acting Deputy Superintendent for

_____

[15] Plaintiff's Exh. T (Dkt. 87-21).

Administration was to investigate Plaintiff's complaints, respond to Plaintiff, and copy Noeth on the response.  Noeth Dep. Tr.[16] at 45-46.

Despite Plaintiff's therapeutic diet being gluten-free, on January 8, 2017, Plaintiff was given a food tray for lunch containing chicken and rice, on top of which was wheat bread.  Plaintiff advised the "feed-up" officers that the tray contained allergens and was cross-contaminated and requested a new food tray.  Plaintiff's Dep. Tr. at 66.  When the feed-up officers refused Plaintiff's request for a replacement tray, Plaintiff removed the wheat bread and ate the rest of the food after which Plaintiff felt nauseous with an "itchy" feeling in his throat.  *Id*. at 66.  For dinner on January 8, 2017, Plaintiff was given pizza which did not comply with his gluten-free therapeutic diet.  Plaintiff informed the officer, Defendant Norton, that the pizza was not in compliance with the gluten-free diet, but Norton responded that the pizza was gluten free so Plaintiff ate it.  *Id*. at 66-67. That evening, at 6:05 P.M., Plaintiff experienced an allergic reaction in the form of anaphylactic shock (severe and potentially life-threatening allergic reaction in which Plaintiff became short of breath and his throat was closing).  *Id*. at 67.  Plaintiff went to vomit in the toilet in his cell but as he was vomiting, Plaintiff lost consciousness and fell, hitting his head.  Plaintiff's Dep. Tr. at 67; DOCCSs' Anaphylactic Treatment Record ("Anaphylactic Record")[17] (Dkt. 87-22).  When Plaintiff regained consciousness, he was in Attica's medical unit with an oxygen mask strapped to his face, and a "telemed" consultation, *i.e.*, a consultation held via teleconference, with a physician from Erie

---

[16] References to "Noeth Dep. Tr." are to the pages of the transcript of Noeth's December 4, 2023 deposition, filed in full by Plaintiff (Dkt. 87-10), and in portions by Defendants as Noeth Declaration Exh. B (Dkt. 88-7 at 31-72).

[17] Plaintiff's Exh. U.

County Medical Center ("ECMC") in Buffalo was underway.  Plaintiff's Dep. Tr. at 68; Anaphylactic Record.  Plaintiff had a lump on his head from the fall, required injections of epinephrine (adrenaline) and diphenhydramine (Benadryl) to counteract the allergic reaction, and was kept overnight in the medical department for observation.  Plaintiff's Dep. Tr. at 69-71; Anaphylactic Record.  The next morning, January 9, 2017, while Plaintiff was still in the medical department, a nurse gave Plaintiff a food tray for breakfast that contained bran flakes cereal which is not gluten free.  Plaintiff's Dep. Tr. at 71.  When Plaintiff told the nurse he was allergic to the cereal, the nurse responded that it was not wheat, but bran, and then yelled at Plaintiff "well, don't effing eat it."  *Id*. at 71-72.  Plaintiff did not receive another breakfast tray.  *Id*. at 72.

In a letter to the Inmate Grievance Committee dated January 9, 2017 ("January 9, 2017 letter"),[18] Plaintiff made a complaint against Attica Correctional Facility, Attica's Health Service Department, and Attica's Food Services Department, regarding the two meals he was served on January 8, 2017, after which Plaintiff had an allergic reaction that required him to be taken to the medical department for treatment.  Plaintiff stated that at lunch on January 8, 2017, "[t]he feed-up officers refused to have my tray replaced by the mess hall.  So I removed the wheat bread, & eat [*sic*] the remainder of the tray.  I later became ill, & layed [*sic*] down."  Dkt. 88-5 at 17.  Plaintiff continued that at dinner that same day, he was given a tray with pizza which Plaintiff was not supposed to eat, so he removed the pizza and ate the salad,[19] then became dizzy and

---

[18] Conners Declaration Exh. A (88-5) at 17-18.

[19] Plaintiff's assertion that he removed the pizza and ate the salad is in contrast to his earlier assertion that he ate the pizza after being assured by Norton that the pizza was gluten free.

sick, vomited, and collapsed.  *Id*.  Plaintiff also requested the complaint be assigned a

grievance number.  *Id*.  The January 9, 2017 letter was assigned Inmate Grievance No.

68135-17 ("second inmate grievance").[20]

In a letter to Beecroft dated January 10, 2017 ("January 10, 2017 letter"),[21]

Plaintiff advised that since arriving at Attica on November 28, 2016, Plaintiff had

repeatedly been provided with food that he could not eat because it was not gluten free,

and that food items were often missing from his food tray.  Plaintiff stated that his

requests that the problems be corrected were not addressed but only caused Plaintiff to

"have to deal with attitudes from the people I ask to correct these problems," and

requested Beecroft to provide training to the staff regarding the proper handling of

therapeutic diets.  At some unidentified time subsequent to his allergic reaction, Plaintiff

maintains that he was served only rice and turkey cubes every day for lunch and dinner

for several weeks.  Plaintiff's Dep. Tr. at 75-76.

On January 11, 2017, Defendant Crane served Plaintiff a breakfast containing

allergens.  Plaintiff informed Crane the tray contained allergens, but Crane refused

Plaintiff's request that Crane contact the mess hall for a replacement tray.  Plaintiff did

not eat the food and when Defendant Crane came to collect the tray, Plaintiff refused to

provide the tray or other items, maintaining he had to keep them as evidence that the

meals that were provided to Plaintiff did not comply with Plaintiff's therapeutic diet.

Plaintiff's Dep. Tr. at 50-51, 101-02.  Among those to whom Plaintiff intended to show

the tray and other items were his social worker Heather McGee ("McGee"), and the area

---

[20] Conners Declaration Exh. A (88-5) at 19.

[21] Plaintiff's Exh. V (Dkt. 87-23).

sergeant who was Crane's supervisor.  *Id*.  Plaintiff's refusal to return the tray and other items resulted in Crane issuing Plaintiff a Tier III Inmate Misbehavior Report ("IMR") charging Plaintiff with refusing a direct order, and improper use of mess hall utensils. Tier III Hearing Packet[22] at 2.  Plaintiff maintains his attempts to defend the IMR were thwarted because the DOCCS hearing officials denied Plaintiff's request to submit as evidence the medical reports pertaining to Plaintiff's January 8, 2016 allergic reaction and also denied Plaintiff's requested witnesses whose testimony Plaintiff intended to present to corroborate Plaintiff's assertion that he retained the tray and other items as proof that he was being served meals that did not comply with his therapeutic diet.

On January 13, 2017, Defendant FSA Beecroft issued a memorandum from Attica's Food Service Department in response to Plaintiff's January 10, 2017 letter, January 13, 2017 Memorandum,[23] advising Plaintiff that "Food Service is aware of your gluten free diet and banana allergy."  *Id*.  Beecroft further advised that if Plaintiff had any problems with his food tray, he could notify the hall captain who in turn would notify Food Service for any necessary correction.

The Tier III disciplinary hearing regarding the IMR commenced on January 25, 2017 before Hearing Officer ("H.O.") Spink ("H.O. Spink"), but was adjourned and rescheduled to February 8, 2017, when the hearing was held without Plaintiff present because Plaintiff was not cooperative on January 25, 2017.  Hearing Packet at 4.  At the conclusion of the Tier III disciplinary hearing on February 8, 2017, Plaintiff was found guilty and sentenced to 120 days in SHU.  *Id*. at 9.  Plaintiff maintains the IMR and

---

[22] Plaintiff's Exh. Y (Dkt. 87-26).

[23] Dkt. 88-4 at 12.  It is not clear from the record exactly to what correspondence from Plaintiff Beecroft was responding.

subsequent guilty disposition were intended to retaliate against him for filing grievances and complaints regarding Defendants' repeated failure to provide him with meals consistent with his therapeutic diet.

On February 26, 2017, Plaintiff filed an inmate grievance No. 68538-17 ("third inmate grievance")[24] against Attica's FSA asserting that same date, Plaintiff was served a lunch consisting of wheat/pasta that did not comply with his therapeutic diet. Plaintiff asserted that the noncompliant meal was not an isolated incident and that Plaintiff had written to the mess hall more than 10 times and filed more than seven grievances concerning improper meals. *Id.*

An investigation into Plaintiff's complaints regarding his therapeutic diet was conducted, following which it was determined on April 17, 2017, that the correction officers do not prepare the therapeutic diet meals, Attica's Food Service began providing Plaintiff with a special diet on November 30, 2016, and had no record about being notified by SHU staff that Plaintiff's food tray was incorrect, that no Food Service employee refused Plaintiff a proper meal, and that the meal sent from the mess hall is the meal that is provided to Plaintiff. Plaintiff's Exhs. W and X. Attica's medical department confirmed that Plaintiff has gluten and banana allergies and that Plaintiff had an allergic reaction that was properly treated. *Id.*

On May 8, 2017, Plaintiff filed inmate grievance No. 69032-17 against the correctional facility and its Food Service Department asserting that over the previous 21 days, he had been served turkey five days per week for either lunch or dinner and sometimes for both ("fourth inmate grievance"). Plaintiff's Exh. AA (Dkt. 87-28). Plaintiff

---

[24] Plaintiff's Exh. Z (Dkt. 87-27).

further complained that during the same time period he had not been served tuna for Friday night dinner.  *Id*.  Plaintiff further asserted the diet he was being served was intended to retaliate against Plaintiff for filing complaints against FSA.

## DISCUSSION

### 1.    Summary Judgment

Both Plaintiff and Defendants move for summary judgment.  Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)). A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof. *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)). Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

Courts, however, "must refrain from assessing competing evidence in the summary judgment record and avoid making credibility judgments." *Saeli v. Chautauqua Cnty., N*Y, 36 F.4th 445, 456 (2d Cir. 2022) (citing *Green v. Town of East Haven*, 952 F.3d 394, 406 (2d Cir. 2020)). "[T]o defeat summary judgment, 'there must be evidence on which the jury could *reasonably* find for the [non-moving party].'" *Saeli*, 36 F.4th at 456 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (italics in *Saeli*). "Moreover, we are not required to assume the truth of testimony 'so replete with inconsistencies and improbabilities that a reasonable jury could not [base a

favorable finding on it].'"  *Saeli*, 36 F.4th at 457 (quoting *Jeffreys v. City of New York*,

426 F.3d 549, 553–55 (2d Cir. 2005)).

**2.    § 1983**

Plaintiff's claim is asserted pursuant to 42 U.S.C. § 1983 ("§ 1983"), which

permits imposing civil liability upon persons who, acting under color of state law, deprive

an individual of rights, privileges, or immunities secured by the Constitution and laws of

the United States.  *Patterson v. County of Oneida, New York*, 375 F.3d 206, 225 (2d

Cir. 2004) (quoting 42 U.S.C. § 1983).  Section 1983, however, "'is not itself a source of

substantive rights.'"  *Id.* (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).

Rather, § 1983 "merely provides 'a method for vindicating federal rights elsewhere

conferred' . . . ."  *Id.*  To succeed on a § 1983 claim, a plaintiff must establish the

challenged conduct "(1) was attributable to a person acting under color of state law, and

(2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or

laws of the United States."  *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir.

1997).  Further, it is basic that liability under § 1983 requires a defendant's personal

involvement in the alleged deprivation of a federal right.  *See Warren v. Pataki*, 823

F.3d 125, 136 (2d Cir. 2016) ("To establish a section 1983 claim, 'a plaintiff must

establish a given defendant's personal involvement in the claimed violation in order to

hold that defendant liable in his individual capacity.'" (quoting *Patterson*, 375 F.3d at

229)).

The elements of a § 1983 claim, as stated, include (1) the deprivation of a federal

constitutional or statutory right, and (2) by a person acting under color of state law.

*Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (citing *Gomez v. Toledo*, 446 U.S. 635,

640 (1980)).  Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed."  *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989); and *Baker*, 443 U.S. at 140).  In the instant case, Plaintiff's claim alleging Defendants were deliberately indifferent to his serious medical needs when they failed to provide him with meals consistent with his therapeutic diet asserts violations of the Eighth Amendment's prohibition against cruel and unusual punishment.

Plaintiff argues in support of summary judgment that the undisputed facts establish all Defendants were personally involved in a denial of Plaintiff's Eighth Amendment rights by subjecting Plaintiff to cruel and unusual punishment, *i.e.*, intentionally ignoring or recklessly disregarding the risk that serving Plaintiff meals containing or cross-contaminated with the allergens would cause Plaintiff to suffer an objectively serious medical condition.  *See*, *generally*, Plaintiff's Memorandum, Plaintiff's Response, and Plaintiff's Reply.  Defendants, in contrast, argue in support of summary judgment that Plaintiff is unable to establish any of the Defendants were personally involved in creating the food trays that did not comply with Plaintiff's therapeutic diet, the failure to provide Plaintiff with a medically necessary diet does not arise to an Eighth Amendment violation, and, alternatively, Defendants are qualifiedly immune from liability on Plaintiff's Eighth Amendment claim.  *See*, *generally*, Defendants' Memorandum, Defendants' Response, and Defendants' Reply.

### A.    Eighth Amendment

The Eighth Amendment, which applies to the States through the Fourteenth Amendment, "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes."  *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); U.S. Const. amend.

VIII.  As such, prison conditions and the treatment prisoners receive while incarcerated are subject to scrutiny under the Eighth Amendment.  *DeShaney v. Winnebago County Dep't of Social Svcs.*, 489 U.S. 189, 199-200 (1989).  "The infliction of pain is unnecessary and wanton, for instance, when it is 'totally without penological justification.'"  *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (further internal quotation omitted)).  "The conditions of a prisoner's confinement can give rise to an Eighth Amendment violation."  *Id*. (quoting *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (citing cases)).

To succeed on an Eighth Amendment deliberate indifference claim, a plaintiff must establish both objective and subjective elements.  *Phelps*, 308 F.3d at 185.  The objective element requires "that the prison officials' transgression was 'sufficiently serious,'" whereas the subjective element requires "that the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' *i.e.*, with 'deliberate indifference to inmate health or safety.'"  *Id*. (quoting *Farmer*, 511 U.S. at 834).

### 1.    Personal Involvement

Preliminarily, the court addresses whether there is sufficient evidence in the record to establish the requisite personal involvement of Defendants in the alleged Eighth Amendment violation.  Civil liability is imposed under § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws, 42 U.S.C. § 1983, requiring a plaintiff, to succeed on a § 1983 claim, establish each individual defendant was personally involved in the alleged constitutional deprivation.  *Kravitz v. Purcell*, 87 F.4th 111, 129 (2d Cir. 2023) ("To 'establish a defendant's individual liability in a suit brought under §

1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation.'" (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013)).  *See Zwick v. Town of Cheektowaga*, 2025 WL 405813, at * 4 (W.D.N.Y. Feb. 5, 2025) ("Personal involvement in the deprivation of a federal constitutional right is the *sine qua non* of liability under § 1983." (citing *Haygood v. City of New York*, 64 F. Supp. 2d 275, 280 (S.D.N.Y. 1999)).  "To do so, 'a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'' "  *Kravitz*, 87 F.4th at 129 (quoting *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009))).

As such, "[a] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority. Rather, the personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (internal alterations, quotations, and citations omitted).  Although in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), the Second Circuit identified five paths to establish a supervisor's personal involvement in an alleged § 1983 violation ("the *Colon* criteria"),[25] more recently, the Second Circuit clarified that "[t]here is no special rule for

---

[25] In particular, the Second Circuit previously recognized that personal involvement of a defendant could be established by showing that

> (1) [he or she] participated directly in the alleged constitutional violation; (2) [he or she], after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) [he or she] created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) [he or she] was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) [he or she] exhibited deliberate indifference to others' rights by failing to act on information indicating that constitutional acts were occurring.

supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676)). In other words, as with other Defendants, Plaintiff "must show that [supervisory defendants] personally knew of and disregarded an excessive risk to [Plaintiff's] health or safety." *Id*. at 619. "This court has found that after *Tangreti*, only the first *Colon* criteria, that defendant directly participated in the alleged unconstitutional violation – the so-called 'active conduct' standard, and the third *Colon* criteria, that defendant 'created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom,' sufficient to establish a supervisory defendant's personal involvement in a § 1983 case as required to establish a viable basis for defendant's personal involvement in the alleged unconstitutional violation." *Flannery v. County of Niagara*, 763 F.Supp.3d 364, 401 (W.D.N.Y. 2025) (*adopting report and recommendation* citing *Marcus v. City of Buffalo*, 2023 WL 5154167, at *5 (W.D.N.Y. Aug. 10, 2023) (citing *Tangreti*, 983 F.3d at 617 n. 4) (citing cases)), *report and recommendation adopted*, 2023 WL 7016546 (W.D.N.Y. Oct. 25, 2023)).

Here, Defendants argue that regardless of whether Plaintiff's Eighth Amendment rights were violated by the provision of meals that did not comply with Plaintiff's therapeutic diet, Defendants Crane, Norton, and Rapini, all employed as correction officers at Attica ("Defendant Correction Officers") were not personally involved in

---

*Brandon v. Kinter*, 938 F.3d 21, 36 (2d Cir. 2019) (quoting *Colon*, 58 F.3d at 873 (bracketed material in *Brandon*)).

preparing or plating Plaintiff's meals and thus cannot be held liable for such violation.

Defendants' Memorandum at 5-6.  FSA Defendants Beecroft and Conners ("FSA

Defendants") also were not involved in preparing or plating Plaintiff's meals, *id*. at 6, and

relied on the "hall captains," described as supervising officers stationed within the

correctional facility who are in charge of a particular floor, Crane Dep. Tr. at 23; Norton

Dep. Tr.[26] at 25; Rapini Dep. Tr.[27] at 69, and Plaintiff to report any food tray issues for

investigation and correction but did not receive any such reports.  *Id*. at 6-7.

Defendants further argue Superintendent Noeth cannot be liable insofar as Noeth is

sued only because he was the recipient of several letters written by Plaintiff advising

that the food trays were not properly prepared in accordance with Plaintiff's therapeutic

diet, *id*. at 8-9, and the record is devoid of any evidence that Noeth was directly involved

in the underlying problems with Plaintiff's food preparation and delivery, or that Noeth

created or permitted the continuation of a policy or custom under which unconstitutional

food practices occurred.  *Id*. at 9-10.

### a.    Defendant Correction Officers

Defendants argue Defendant Correction Officers were responsible only for

serving Plaintiff with the food tray provided by Attica Food Service while Plaintiff was

housed in SHU, Defendants' Memorandum at 5, that Defendant correction officers were

not involved in preparing or plating Plaintiff's meals, *id*., and do not recall Plaintiff ever

notifying or otherwise reporting to them any issues regarding the food on Plaintiff's tray.

---

[26] References to "Norton Dep. Tr." are to the page number of the transcript of Norton's November 8, 2023 deposition, filed in full as Plaintiff's Exh. G (Dkt. 87-8), and in portions as Norton's Declaration Ehx. B (Dkt. 88-8 at 7-51).

[27] References to "Rapini Dep. Tr." are to the page number of the transcript of Rapini's November 6, 2023 deposition, filed in full as Plaintiff's Exh. E (Dkt. 87-6), and in portions as Rapini Declaration Exh. B (Dkt. 88-9 at 6-37).

*Id*.  In opposition, Plaintiff does not dispute that Defendant Correction Officers were not personally involved in choosing food items or otherwise preparing Plaintiff's food trays, but argues that evidence in the record establishes Defendant Correction Officers were required to immediately notify the mess hall if there was a problem with an inmate's food tray and obtain another, properly prepared food tray for the inmate, but repeatedly failed to do so despite numerous complaints by Plaintiff to Defendant Correction Officers.  Plaintiff's Response at 4-5.  In further support of summary judgment in favor of Defendant Correction Officers, Defendants again deny ever being notified by Plaintiff of being served a food tray that did not comply with Plaintiff's therapeutic diet. Defendants' Response at 3-4.

Because it is undisputed that Defendant Correction Officers had no responsibility for the preparation of Plaintiff's food trays, the court considers whether there is evidence in the record establishing at least a genuine issue of material fact regarding whether Plaintiff notified Defendant Correction Officers when Plaintiff received an improper food tray and, if so, whether Defendant Correction Officers failed to take proper action to remedy the situation upon being notified by Plaintiff.  Here, the record establishes issues of fact exist regarding whether Plaintiff notified Defendant Correction Officers about non-compliant food trays as well as whether Defendant Correction Officers failed to take appropriate action when notified about a problem with Plaintiff's food trays.

In particular, Defendants argue that as correction officers, Defendants Crane, Norton, and Rapini were the lowest ranking DOCCS's officers without any authority to create, make or change any Food Service policies.  Defendants' Memorandum at 5. Defendants further argue each Defendant Correction Officer has stated he would have

immediately contacted the supervising officers who conducted rounds on their
respective companies every day, to rectify any complaints Plaintiff had regarding his
food tray, but Plaintiff never made any such complaints either to Defendant Correction
Officers or to the supervising officers including Sergeants, Lieutenants, and Captains.
*Id*. (citing Crane Declaration (Dkt. 88-6) ¶¶ 17-26 (averring Plaintiff had multiple
opportunities every day to report an improper food tray to correction officers and
supervising officers, but never did); Norton Declaration (Dkt. 88-1)[28] ¶¶ 22-27 (same);
Rapini Declaration (Dkt. 88-9) ¶¶ 16-25 (same)).  Each Defendant Correction Officer
gave similar deposition testimony regarding how an SHU inmate's complaint about
receiving an incorrect food tray, including a complaint from Plaintiff had he made one,
would be handled by a correction officer or the hall captain or other supervising officer.
*See* Crane Dep. Tr. at 37-39, 44-45, 58-59 (explaining if an inmate advised a C.O. of an
issue with the contents of a food tray, the C.O. would alert the hall captain and either
the C.O. or the hall captain would contact the mess hall and arrange for the correct tray
to be sent); Norton Dep. Tr. at 26-27, 34, 37-39, 63 (same); and Rapini Dep. Tr. at 34,
36, 49, 52-53 (same).  Each Defendant Correction Officer, however, also gave
deposition testimony that he did not recall ever being advised Plaintiff had food
allergies, or that Plaintiff ever alerted him that Plaintiff had been provided with a food
tray that was not consistent with Plaintiff's therapeutic diet.  *See* Crane Dep. Tr. at 39,
42-44 (denying any recollection of handling a complaint made by Plaintiff regarding his
food tray not being in compliance with Plaintiff's therapeutic diet); Norton Dep. Tr. at 35

---

[28] The court notes that insofar as Norton avers that Plaintiff claims Norton failed to provide Plaintiff with
meals that did not contain allergens in 2017 and 2018, Norton Declaration ¶ 4, the Amended Complaint is
devoid of any allegations pertaining to 2018.

(same); Rapini Dep. Tr. at 35-36, 53, 56 (same).  Defendant Crane concedes that

based on Plaintiff's allergy to wheat, Plaintiff should have been provided with a different

food tray if Plaintiff complained on January 8, 2017, that the food tray he received for

lunch contained wheat bread and the dinner tray contained pizza.  Crane Dep. Tr. at 55-

56, 59.  *See* Norton Dep. Tr. at 60 (conceding if Plaintiff had complained that he could

not eat pizza served to him, Norton would have alerted someone about the issue), and

Rapini Dep. Tr. at 34-38 (explaining if Plaintiff or any other inmate complained about a

problem with a special diet tray, Rapini would have alerted Food Service).  This is

because although an inmate who receives an incorrect food tray can file a grievance

about the improper tray, the inmate was dependent on the C.O. and hall captain to

report the mistake in order to receive a replacement food tray in time for the meal being

served.  Crane Dep. Tr. at 64-65; Norton Dep. Tr. at 63.

        In contrast, Plaintiff gave deposition testimony containing numerous references

to having been provided with a food tray containing items that were not consistent with

his therapeutic diet including bran flakes cereal which contain wheat instead of rice or

corn flakes which do not, wheat bread instead of rice cakes, wheat pasta, macaroni and

cheese, breaded (wheat) chicken patties, and mashed potatoes that were made with

wheat flour, and was often missing portions of his meal such as rice cakes, sugar and

jelly packets, fruit, vegetables, meat, and juice.  *See* Plaintiff's Dep. Tr. at 34-36.

Plaintiff also maintains that each time he was provided with an incorrect food tray,

Plaintiff notified either a correction officer or supervisory officer, as well as Plaintiff's

mental health counselor, but that no action was ever taken to correct the situation, and

Defendant Correction Officers ignored him.  *Id*. at 37-39.  Plaintiff's letters to Attica's

FSA Beecroft and Superintendent Noeth also failed to yield any corrective action.  *See*, *e.g.*, *id*. at 41-42 (discussing Plaintiff's January 10, 2017 letter to Beecroft advising of Plaintiff's complaints to Attica's Food Service regarding proper handling of therapeutic diets and requesting Food Service workers receive training on the preparation of therapeutic diets).  Further, there are letters, complaints, and inmate grievances in the record in which Plaintiff asserts he notified Defendant Correction Officers that the food trays served to him in Attica's SHU contained allergens, but no corrective action was taken.  *See*, *e.g.*, January 10, 2017 letter to Beecroft (Plaintiff's Exh. V (Dkt. 87-23)); second inmate grievance (Plaintiff's Exh. Z (Dkt. 87-27).

Whether Plaintiff alerted Defendant Correction Officers that his food trays contained allergens is key to whether Defendant Correction Officers, by failing to take corrective measures regarding the improper food trays, were personally involved in violating Plaintiff's Eighth Amendment rights.  The statements in the declarations and the depositions of Defendants Correction Officers establishes all three admit they knew that if an inmate on a special or therapeutic diet complained about a food tray, the correction officer was required to alert either the hall captain, another supervisory officer, or the mess hall to arrange for another food tray.  All three Defendant Correction Officers also denied that Plaintiff ever had any issues with his food tray not being in compliance with his therapeutic diet, despite evidence provided by Plaintiff that he filed letters and inmate grievances alleging Defendant Correction Officers ignored such complaints.  This disputed evidence points to two different conclusions, only one of which can be true, *i.e.*, either Plaintiff never brought his issues with his food trays to the attention of Defendant Correction Officers, or Plaintiff did alert Defendant Correction

Officers to the problems with his food trays but Defendant Correction Officers failed to take any action to remedy the problems. [29]  As discussed, however, Discussion, *supra*, at 16-17, the court is not permitted on summary judgment to resolve disputed issues of material fact or to assess credibility.  *Saeli*, 36 F.4th at 456 (courts are to "refrain from assessing competing evidence in the summary judgment record and avoid making credibility judgments.").  Summary judgment thus should be DENIED on Plaintiff's Eighth Amendment claim against Defendant Correction Officer based on a lack of personal involvement.

### b.    FSA Defendants

Defendants argue the FSA Defendants were not personally involved in any Eighth Amendment violation based on Plaintiff's failure to receive his therapeutic diet because the FSA Defendants relied on either the hall captain or Plaintiff to advise them of any problems with Plaintiff's food trays so that FSA Defendants could investigate and correct any problems, Defendants' Memorandum at 6, Conners recalls only one instance where a problem with Plaintiff's food tray was reported on January 11, 2017, after which Conners immediately sent another food tray to Plaintiff, *id.* at 6-7, and the mere receipt of a letter from an inmate is not enough to establish personal involvement. *Id.* at 7.  Plaintiff argues that FSA Defendants failed to properly supervise Defendant Correction Officers, Plaintiff's Memorandum at 7, and it was incumbent upon both Beecroft and Conners to ensure that Plaintiff received the proper therapeutic diet upon

---

[29] The court recognizes it is possible that Plaintiff has conjured up a false claim regarding his alleged improper food trays or Defendant Correction Officers' refusal to take corrective action in response to Plaintiff's complaints about improper food trays; however, no evidence supports such an inference sufficient to require granting summary judgment to Defendant Correction Officers based on a lack of personal involvement in the claimed Eighth Amendment violations.

receiving the numerous letters Plaintiff sent to both Beecroft and Conners complaining that his therapeutic diet was not being followed.  *Id*.; Plaintiff's Response at 6-7.  In further support of summary judgment, Defendants argue that not only were the FSA Defendants not personally responsible for food preparation or placing food items on the food trays, but FSA Defendants also did not create policies or customs relating to food preparation, or training kitchen staff and no evidence supports such a finding. Defendants' Reply at 4-5.  Defendants also maintain that evidence in the record establishes that when Defendant Conners was informed of a problem with Plaintiff's food tray, which happened on only one occasion, Defendant Conners immediately rectified the situation by having another food tray that conformed to Plaintiff's therapeutic diet, provided to Plaintiff.  *Id*. at 5.  Defendants also repeat that FSA Defendants cannot be held liable for violating Plaintiff's Eighth Amendment rights based solely on receiving letters from Plaintiff complaining that his meals he received were not in compliance with Plaintiff's therapeutic diet.  *Id*. at 5-6.

Here, the undisputed evidence in the record fails to establish an issue of fact as to whether Defendant Beecroft was personally involved in the Eighth Amendment violation based on deliberate indifference to Plaintiff's required therapeutic diet as Plaintiff alleges.  In particular, Beecroft avers that he was, at all times relevant to this action, Attica's Food Services Administrator I ("FSA").  Beecroft Declaration ¶ 1.[30] Beecroft explains that as FSA, he was responsible for ensuring all incarcerated individuals receive three nutritious meals per day including, *inter alia*, those inmates

---

[30] The court notes that Beecroft's averment that not only did he not provide Plaintiff with "meals that contain Allergens [*sic*] in 2017 and 2018," as Plaintiff claims, but that Beecroft did not work at Attica in 2018, Beecroft's Declaration ¶ 4, misreads the Amended Complaint in which Plaintiff alleges being served meals containing allergens in 2016 and 2017, but does not mention 2018.

assigned to SHU who receive special diets either to accommodate religious needs or for medical reasons which would include allergies, but Beecroft does not personally prepare meals or distribute food trays. *Id*. ¶¶ 8-12. According to Beecroft, when an inmate is prescribed a therapeutic meal, the Therapeutic Diet form is completed by the medical provider prescribing the diet, which is sent to Food Service and, upon receiving the completed form, Food Service begins providing the inmate with the specific therapeutic diet. *Id*. ¶¶ 13-15. Upon being transferred to SHU, it is the responsibility of the inmate to inform the correction officers that he is on a special diet, *id*. ¶¶ 16, 28, as well as if incorrect food items are included on the inmate's food tray. *Id*. ¶¶ 18-21. Beecroft avers that as FSA, Beecroft was not responsible for any meals missed by Plaintiff because of incorrect food items, nor did Beecroft prepare or deliver the meals. *Id*. ¶¶ 21-25. Beecroft did not supervise any meal preparation. Beecroft Dep. Tr. at 53-54. Beecroft further explains that if an inmate on a special or therapeutic diet misses three food trays, the therapeutic diet would be canceled and there would be documentation of the cancelation. Beecroft Declaration ¶ 29. Beecroft's statement in his January 13, 2017 Memorandum to Plaintiff advising that Food Service was aware both that Plaintiff was to be served a gluten-free diet and no bananas, can only be construed as establishing both that Attica's Food Service was aware of Plaintiff's therapeutic diet and that the diet was not canceled. According to Beecroft, if he became aware that an inmate was not receiving his special diet, Beecroft would remind the staff of the guidelines for that particular diet and have the staff check the tray before it was sent out for delivery to the inmate. Beecroft Dep. Tr. at 59-60, 90-91. Beecroft testified that in response to each of Plaintiff's letters, including Plaintiff's letters dated November

30, 2016, December 19, 2016, and January 10, 2017, he would have spoken with the

Food Service staff about the guidelines for specific diets and have them check the tray

prior to leaving Food Service to ensure the tray complied with the specific diet. *Id*. at

62-77.  In response to Plaintiff's January 10, 2017 letter, on January 13, 2017, Beecroft

specifically advised Plaintiff that Plaintiff should bring any problems with his food tray to

the attention of the hall captain. *Id*. at 89-90.

  The gist of Beecroft's statements made in his declaration and at his deposition is

that Beecroft was not personally responsible for the contents of any particular inmate's

food tray or diet but, rather, relied on inmates in SHU to inform hall captains of any

problems with a food tray, and the hall captain was then to notify Food Service and

arrange for another tray, containing only food items appropriate for the inmate's specific

diet, to be sent for the inmate.  Accordingly, there is no evidence establishing an issue

of fact that Beecroft was personally involved in any Eighth Amendment violation based

on the service of improper food trays to Plaintiff in Attica's SHU.

  Similar to Beecroft, the undisputed evidence in the record pertaining to

Defendant Conners also undisputably establishes no personal involvement in the

asserted Eighth Amendment violations based on deliberate indifference to the risk that

consuming foods containing or contaminated by the allergens posed to Plaintiff's health.

In particular, Conners avers that at all times relevant to the Amended Complaint, he was

employed at Attica as Food Service Administrator ("FSA") II, for which his duties

included assisting in Attica's Food Service Department to provide Attica's inmates daily

with three nutritious meals.  Conners Declaration ¶¶ 1, 8.[31]  Conners did not personally prepare any meals or distribute food trays.  *Id*. ¶ 11.  Conners explains the process by which meals are provided to an inmate for whom therapeutic diet is prescribed including that a Therapeutic Diet form is completed by the inmate's medical provider which is placed in the inmate's medical record with a copy forwarded to Food Service, after which the inmate begins to receive the specific diet in accordance with the Therapeutic Diet form.  *Id*. ¶¶ 13-15.  Food Service is notified when an inmate is assigned to SHU and the inmate then is sent a food tray containing his therapeutic diet to eat in his cell, but it is the inmate's responsibility to inform the corrections officers in SHU that the inmate is on a special diet.  *Id*. ¶ 16.  The regular movement of inmates within Attica requires Food Service to constantly track the location within the correctional facility of inmates prescribed special diets.  *Id*. ¶¶ 17-18.  Conners is not responsible for preparing meals or delivering food trays, *id*. ¶¶ 25-26, including Plaintiff's the food trays delivered to Plaintiff on January 8, 2017, *id*. ¶ 27, nor is Conners responsible for any meals Plaintiff missed because of improper food items on his food tray, *id*. ¶ 22, and Conners has never intentionally denied any inmate access to the person who could correct any issues Plaintiff had with his food tray.  *Id*. ¶¶ 23-24.  According to Conners, Food Service only received notice that an inmate received an incorrect food tray if the inmate notified the hall captain or other correction officer in charge who would then notify Food Service, nor would Food Service be notified if an inmate had an allergic reaction to any food.  Conners Dep. Tr. at 65.

---

[31] Although Conners states Plaintiff alleges his Eighth Amendment rights were violated when he was deprived of his therapeutic diet in 2017 and 2018, Conners Declaration ¶ 4, the Amended Complaint contains no allegations pertaining to 2018.

Conners explains that because correction officers make rounds of their respectively assigned companies every hour, Plaintiff would had ample opportunity to alert the correction officers as to any problems with his food tray, Conners Declaration ¶ 20, and Plaintiff also could have reported his food tray issues to a member of Attica's administrative team, including Attica's superintendent or deputy superintendents, all of whom were required to walk the entire correctional facility at least once a week. *Id.* ¶ 21. Conners recalled one occasion, the date of which Conners did not remember, where the mess hall received a call from SHU advising there was a problem with Plaintiff's food tray, and another food tray was immediately prepared for Plaintiff and delivered to Plaintiff during the meal period. *Id.* ¶¶ 33-34, 38 (citing Conners Dep. Tr. at 64-65). Although Conners was notified of Plaintiff's allergic reaction on January 8, 2017, attributed to Plaintiff's ingestion of wheat or gluten, in connection to the investigation of the incident, Conners reported that Food Service was never notified of any problem with Plaintiff's food tray. Conners Declaration ¶¶ 35-36. Conners also points to communications to Plaintiff establishing Conners addressed all written concerns regarding missing tray items. *Id.* ¶ 40 (referencing Conners Declaration Exh. A at Bates 217 (Dkt. 88-5 at 33) (Conners responding to Plaintiff's third inmate grievance regarding Plaintiff's assertion that he was served pasta containing wheat for lunch on February 26, 2017, explaining Food Service's investigation of the third inmate grievance could neither confirm nor deny the allegation but Food Service never received any notification from SHU and, thus, took no corrective action); Bates 220 (Dkt. 88-5 at 34) (Conners, in responding to Plaintiff's fourth inmate grievance dated May 8, 2017, complaining he was served turkey cubes five days per week for each of the prior three

weeks during which time he was never served tuna salad, asserted that out of the 21 meals served each week, turkey cubes are served no more than twice, and that Plaintiff was not served tuna salad because it was omitted from the gluten free diet per the direction of the dietician who prepares the menus); and Bates 221 (responding on March 6, 2017, to a message Plaintiff sent to Defendant Noeth complaining about being served foods that are inconsistent with Plaintiff's gluten and bananas allergies and that Plaintiff's food trays regularly miss items by reminding Plaintiff he was previously advised to bring any issues regarding Plaintiff's food tray to the hall captain who could then notify Food Service to have the problem corrected, and also advising that Food Service could not address the problem Plaintiff raised in his January 14, 2017 letter[32] because the problem was not specified).

Other evidence in the record establishes Defendant Conners, upon learning of Plaintiff's allergic reaction attributed to the presence on his lunch and dinner food trays containing wheat or gluten, participated in an investigation into the incident commenced by Attica Inmate Grievance Coordinator Alyson Romesser ("Romesser").  Conners Dep. Tr. at 70-71; Conners Declaration Exh. A at Bates 70 (Dkt. 88-5 at 25) (Conners responding to Romesser's January 12, 2017 e-mail requesting whether Plaintiff contacted Food Service about issues with his food tray and whether Plaintiff is on a therapeutic diet by stating that Plaintiff was ordered a gluten free therapeutic diet as of November 30, 2016, and that except for a complaint on January 11, 2017, which was immediately remedied, Food Service was not notified of any problems with Plaintiff's food trays).  Conners further emphasized that the procedure by which an inmate in SHU

---

[32] The record does not contain any letter from Plaintiff dated January 14, 2017.

could have a food tray problem remedied was to notify the hall captain or area sergeant who was then responsible for contacting the mess hall to arrange for a replacement food tray. *Id*. at 76-78. Significantly, the Superintendent's response to Plaintiff's second inmate grievance regarding Plaintiff's allergic reaction on January 8, 2017, states that Food Service has no record about being notified that Plaintiff received an incorrect food tray on January 8, 2017. *Id*. at 82-85. Conners agrees with Beecroft that the meal trays are prepared in the mess hall by inmates working in Food Service under the supervision of a cook and head cook, with the therapeutic meals prepared in a separate area in the mess hall and the contents of food trays for special diets confirmed by the cooks and head cooks. *Id*. at 86-88. Based on the procedure followed by Food Service, Conners adamantly maintains that Plaintiff's food tray would have been correctly prepared and any issues Plaintiff had must be attributed to the wrong tray being delivered to Plaintiff, in which case Plaintiff should have alerted the hall captain to notify the mess hall. *Id*. at 92-93. Conners's deposition testimony regarding the procedure for meal preparation and by which an SHU inmate can have an improper food tray corrected is consistent with statements made by other DOCCS employees contacted regarding the January 8, 2017 incident in which Plaintiff had an allergic reaction after eating food on his food tray that either contained or was cross-contaminated with wheat or gluten. See Conners Dep. Tr. at 95-97 (referring to conversation between Attica's inmate grievance program supervisor Debbie Fuller and Attica Sergeant Edward Condon who described similar policy and procedure for preparing and correcting food trays for inmates on special diets, including therapeutic diets). Moreover, that both SHU and Food Service have no record of any complaint from Plaintiff regarding issues of receiving a food tray

containing food items that did not comply with Plaintiff's therapeutic diet points to SHU's failure to make such record, rather than Food Service.

The record thus fails to establish any issue of fact that Conners was responsible for directly taking corrective action when advised of Plaintiff's issues with his food trays, and also establishes that the one time that Food Service was made aware of a problem with Plaintiff's lunch tray on January 11, 2017, corrective action was immediately taken to remedy the situation.

To summarize, there is undisputed evidence in the record that although both Beecroft and Conners were responsible for ensuring all inmates incarcerated at Attica were fed three nutritious meals a day including those on special diets, neither Beecroft nor Conners was personally engaged in food preparation or tray preparation, that the cook or head cook, non-parties to the instant action, was responsible for ensuring the food items on the special diet food trays complied with the relevant diet requirements, and that Food Service depended on notifications from hall captains or other correction officers regarding issues with any inmate's food tray. That Food Service has no record of any issue with Plaintiff's food trays, other than on January 11, 2017, is consistent with FSA Defendants' statements that no such issues were received from SHU, either because Plaintiff never made any complaint, or Defendant Correction Officers failed to bring such complaint to the attention of the hall captain or mess hall, a disputed issue that pertains only to personal involvement of Defendant Correction Officers. *See* Discussion, *supra*, at 26-27.

Accordingly, with regard to the FSA Defendants Conners and Beecroft, for lack of personal involvement in the alleged Eighth Amendment violation, Defendants' motion should be GRANTED and Plaintiff's motion should be DENIED.

### c.    Defendant Noeth

Defendants argue Defendant Noeth was not personally involved in any violation of Plaintiff's Eighth Amendment rights because Noeth, as Attica's Superintendent, had minimal personal involvement limited to acting as a supervisory official who referred Plaintiff's complaints and letters to appropriate staff for investigation.  Defendants' Memorandum at 8-9.  On the one occasion in February 2017 that Noeth received a letter from Plaintiff alleging ongoing issues with his food tray, Noeth immediately contacted his deputy superintendent to have the issue remedied.  *Id*. at 9-10.  In opposition, Plaintiff argues Defendants have "mischaracterized Noeth's involvement as a simple messenger" despite doing more than simply passing along Plaintiff's complaints to a deputy superintendent.  Plaintiff's Response at 7.  Plaintiff specifically references Noeth's handwritten notation on Plaintiff's December 19, 2016 letter indicating a deputy superintendent was to investigate Plaintiff's complaint about repeated problems with his food tray, then respond to Plaintiff an "cc me on response," asserting the notation establishes Noeth took affirmative action to ensure Plaintiff was not served any food trays containing allergens, yet failed to follow up resulting in Plaintiff suffering a life-threatening allergic reaction on January 8, 2017, and Noeth also signed the Superintendent's Review of Disciplinary Disposition Form pertaining to the IMR filed against Plaintiff on January 11, 2017, after Plaintiff refused to return his tray and other items to the SHU officers.  *Id*. at 7-10.  *See also* Plaintiff's Memorandum at 7 (arguing

Noeth, as Attica's Superintendent, discussed with Plaintiff his therapeutic diet, instructed subordinates to remedy Plaintiff's problems with his food trays, but "never actually ensured that Plaintiff's Diet Order was complied with" but was "derelict in his duty."). In further support of summary judgment, Defendants argue a supervisory official cannot be held liable under § 1983 based solely on position, and Noeth's actions with respect to Plaintiff's food tray issues are insufficient to establish Noeth's personal involvement in any Eighth Amendment violation. Defendants' Reply at 5-7. *See also* Defendants' Response at 5 (same). Preliminarily, the court observes that although described in the Amended Complaint as "superintendent at Attica Correctional Facility" at "all times relevant" to this action, Amended Complaint ¶ 8, Defendant Noeth was Deputy Superintendent of Attica and did not become Superintendent until January 2017.[33] *See* Noeth Dep. Tr. at 7.

Here, Plaintiff is alleging Defendant Noeth failed to act on information that the unconstitutional acts were occurring. *See Brandon*, 938 F.3d at 36. In *Ortiz-Rodriguez v. New York State Dept. of Correctional Services*, 491 F.Supp.2d 342, 347 (W.D.N.Y. 2007) ("*Ortiz-Rodriguez*"), on which Defendants rely in support of their argument that Defendants Noeth was not personally involved with Plaintiff's food tray issues, Defendants' Memorandum at 8-9, the plaintiff inmate alleged the correctional facility's superintendent was personally involved in an alleged Eighth Amendment violation based on a denial of medical care by failing to properly screen physicians prior to hiring them, and also affirming the denial of the plaintiff's grievance against a particular

---

[33] The precise date on which Noeth became Attica's Superintendent is not in the record. *See* Noeth Dep. Tr. at 7 (Noeth stating he could not recall the exact date he became Attica's Superintendent).

physician whom the plaintiff alleged failed to provide proper medical care.  *Ortiz-Rodriguez*, 491 F.Supp.2d at 346.  Because the evidence in the record established that, at most, the defendant superintendent forwarded to his staff documents regarding the plaintiff's alleged improper medical treatment, the court determined the supervisory was not personally involved in the alleged Eighth Amendment violation.  *Id*. at 347 ("'Where a supervisor's involvement in a prisoner's complaint is limited to forwarding of correspondence to appropriate staff, the supervisor has insufficient personal involvement to sustain a § 1983 cause of action.'"  *Ortiz-Rodriguez v. New York State Dept. of Correctional Services*, 491 F.Supp.2d 342, 347 (W.D.N.Y. 2007) ("*Ortiz-Rodriguez*") (quoting *Liner v. Goord,* 310 F.Supp.2d 550, 555 (W.D.N.Y.2004), and citing *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (summary judgment affirmed where commissioner referred plaintiff's letter to the prison superintendent)).  This remains true after *Tangreti*.  *See Marcus*, 2023 WL 5154167, at * 5 (citing *Smart v. Annucci*, 2021 WL 260105, at * 5 (S.D.N.Y. Jan. 26, 2021) (dismissing inmate's complaint alleging defendants, both prison officials who allegedly failed to act on the plaintiff's complain about constitutional violation because such allegations did not support an inference that the defendants, through their own individual actions, violated the Constitution, stating that "[f]ailing to correct another officer's violation does not suffice to establish a supervisor's direct violation of a plaintiff's constitutional rights)).  Accordingly, Noeth's mere receipt of complaints from Plaintiff regarding problems with Plaintiff's food trays and therapeutic diet does not assert an Eighth Amendment violation against Noeth.

Plaintiff argues that *Ortiz-Rodriguez* is factually inapposite because, in contrast to the instant case, in *Ortiz-Rodriguez* there was no evidence the superintendent was aware of the alleged insufficient medical care at the time of the inmate plaintiff's treatment, nor was there evidence the superintendent actually reviewed the plaintiff's grievance.  Plaintiff's Response at 8 (citing *Ortiz-Rodriguez*, 491 F.Supp.2d at 347).  Plaintiff also points to the fact that Defendant Noeth provided a response to Plaintiff's second inmate grievance indicating the grievance was accepted in part insofar as Plaintiff alleged that after eating food items containing allergens, Plaintiff had an allergic reaction and required medical intervention.  Plaintiff's Response at 8 (referencing Case History and Records pertaining to Plaintiff's second inmate grievance, Plaintiff's Exh. X (Dkt. 87-25)).  In light of *Tangreti*, however, Noeth's alleged failure to act on Plaintiff's complaints regarding the conduct of others fails to establish Noeth's direct violation of Plaintiff's constitutional rights.  *Marcus*, 2023 WL 5154167, at * 5; *Smart*, 2021 WL 260105, at *5.

Plaintiff further differentiates *Mateo v. Fischer*, 682 F.Supp.2d 423 (S.D.N.Y. 2010) ("*Mateo*"), cited by Defendants for the proposition that "'the receipt of letters or grievances, by itself, does not amount to personal involvement.'"  Defendants' Memorandum at 9 (quoting *Mateo*, 682 F.2d at 431).  Although in *Mateo*, the court specifically found that a supervisor's "pro forma" response to a grievance does not suggest personal involvement, *Mateo*, 682 F.Supp.2d at 431, the court continued that personal involvement may be found where, rather than summarily denying a grievance, the supervisory official provides a "detailed, specific response to a plaintiff's complaint," thereby "suggest[ing] that the supervisor has considered the plaintiff's allegations and

evaluated possible responses." *Id*. at 430-31 (citing *Walker v. Pataro*, 2002 WL
664040, at * 13 (S.D.N.Y. Apr. 23, 2002) (personal involvement will be found only when
a supervisory official "receives and acts on a prisoner's grievance (or substantively
reviews and responds to some other form of inmate complaint)")).  In *Mateo*, the court
concluded that because the supervisory defendant received the plaintiff's letters,
forwarded at least two of the letters to subordinates for investigation, and sent the
plaintiff a response advising the plaintiff had provided insufficient information to support
his allegations, the supervisory official had, at most, "only the scantest awareness" of
the plaintiff's claims and, thus, was not personally involved in the alleged constitutional
violations.  *Id*. at 431.  Regardless of whether the court's reasoning in *Mateo* survives
after *Tangreti*, here, Plaintiff's complaints to Noeth fail to plausibly allege Noeth's
personal involvement for other reasons.

In particular, two of Plaintiff's letters to Noeth regarding issues with his
therapeutic diet attribute the problems with his food trays containing allergens to the
mess hall not knowing how to prepare meals suitable for a gluten-free diet.  *See*
Plaintiff's December 19, 2016 letter (Noeth Declaration Exh. A at Bates 193 (Dkt. 88-7
at 29), February 26, 2017 letter (Noeth Declaration Exh. A at Bates 199 (Dkt. 88-7 at
30)).  As discussed in connection with Plaintiff's claims against the FSA Defendants,
*see* Discussion, *supra*, at 35, however, there is no evidence in the record that the
problems with Plaintiff's receipt of an incorrect food tray arises from Food Service but,
rather, from a failure within SHU to report a problem with Plaintiff's food trays, either
because Plaintiff never reported the problem to Defendant Correction Officers, or the
Defendant Correction Officers failed to forward the complaint to the hall captain, or the

hall captain, a non-party, failed to contact the mess hall about such complaints.  In any event, these two letters fail to advise Noeth of a problem with Defendant Correction Officers or the hall captain.  Accordingly, the letters fail to establish a basis on which to find Defendant Noeth was aware of and thus personally responsible for handling Plaintiff's complaint of incorrect food trays in SHU.

Further, in Plaintiff's other two letters to Defendant Noeth, being two letters dated February 12, 2017, Noeth Declaration Exh. A at Bates 128-29 (Dkt. 88-7 at 10-11) ("first February 12, 2017 letter"), and at Bates 130-31 (Dkt. 88-7 at 12-13) ("second February 12, 2017 letter"), Plaintiff complains, respectively, to Noeth and non-party Deputy Bishop, that the disciplinary hearing regarding the IMR was conducted *in absentia*, and requests a review of the disciplinary hearing, as well as that Plaintiff's time in SHU be converted to time in keeplock.  Not only are these requests not relevant to Plaintiff's Eighth Amendment violation claim, but in the letters Plaintiff also advises that after receiving many food trays containing food items that are incompatible with a gluten-free diet, the issue was resolved after Plaintiff's allergic reaction on January 8, 2017.  *Id*. Accordingly, these letters did not alert Defendant Noeth to an on-going problem with Plaintiff's food trays which Noeth then failed to act upon and, as such, fail to establish Noeth was personally involved in the alleged violations of Plaintiff's Eighth Amendment rights.

Summary judgment thus should be GRANTED in favor of Defendant Noeth based on a lack of evidence from which a reasonable jury could find that Defendant Noeth was personally involved in the Eighth Amendment violations as Plaintiff alleges.

Having established that Defendant Correction Officers, but not FSA Defendants or Defendant Noeth were personally involved in the alleged constitutional deprivation, the court next addresses whether the failure to remedy Plaintiff's receipt of improper meals arises to a violation of the Eighth Amendment based on deliberate indifference to Plaintiff's serious medical needs.

### 2.    Objective Element

As discussed, Discussion, *supra*, at 19, to succeed on an Eighth Amendment deliberate indifference claim, a plaintiff must establish both objective and subjective elements with the objective element requiring that the alleged transgression by the defendant prison officials be "sufficiently serious."  *Phelps*, 308 F.3d at 185.  In the instant case, Defendants do not specifically argue that the provision to Plaintiff of food trays containing items that did not comply with Plaintiff's therapeutic diet does not establish the objective element, but the undersigned, in the interest of completeness, considers the issue.

"[T]he Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.'"  *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1990), *cert. denied*, 450 U.S. 1041 (1981)).  *See also Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) ("The denial of a medically prescribed diet may constitute an Eighth Amendment violation under certain circumstances."); and *Chapdelaine v. Keller,* 1998 WL 357350, at *12 (N.D.N.Y.Apr.16, 1998) ("[T]he Eighth Amendment requires that

prisoners receive nutritionally adequate food prepared and served in conditions that do not present an immediate danger to the health of the inmates who consume it").  To establish that the denial of a medically prescribed diet constitutes an Eighth Amendment violation, the plaintiff must show there was a "sufficiently serious condition" that resulted from the food not being received.  *Labounty v. Gomez,* 1998 WL 214774, at *2 (S.D.N.Y. 1998).  A condition is serious for constitutional purposes if it presents "a condition of urgency that may result in degeneration or extreme pain."  *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks and citations omitted).  *See Johnson v. Harris*, 479 F.Supp. 333, 336-37 (S.D.N.Y. 1979) (finding a violation of the Eighth Amendment where the diabetic inmate plaintiff was continually denied a medically necessary diet resulting in declining health).  Further, the "sufficiently serious" standard prescribes not only the denials of medical treatment that result in "torture or lingering death," but also those denials of medical care that "may result in pain and suffering which no one suggests would serve any penological purpose." *Estelle v. Gamble,* 429 U.S. 97, 103 (1976)).

In the instant case, the record contains medical records from which a trier of fact could conclude that Plaintiff suffers from food allergies, specifically to wheat and bananas, as well as that after consuming food served to him that contained wheat Plaintiff suffered a severe allergic reaction.  In particular, on January 8, 2017, Plaintiff was served a lunch of chicken and rice atop of which was placed wheat bread which, although Plaintiff did not eat the bread, cross-contaminated the chicken and rice.  After eating the chicken and rice, Plaintiff felt ill.  For dinner later that same day, Plaintiff was served pizza which Defendant ate only after being advised it did not contain wheat.

Within a few minutes of eating the pizza, Plaintiff experienced anaphylactic shock in which his throat began closing, and Plaintiff passed out, hitting his head, and required medical care consisting of injections of epinephrine and Benadryl to counter the reaction. *See Robles*, 725 F.2d at 16 (finding in context of motion to dismiss allegation that defendants contaminated the inmate plaintiff's food, rendering the food inedible, stated Eighth Amendment claim); *Johnson*, 479 F.Supp. at 336-37. There can be no reasonable argument that the pain and suffering Plaintiff endured as a result of eating food served to him while in SHU which did not comply with Plaintiff's therapeutic diet was in furtherance of any legitimate penological purpose. *Estelle*, 429 U.S. at 102. That Plaintiff's medical records indicate that Plaintiff in fact suffered anaphylactic shock after consuming food on January 8, 2017, provides strong evidence that Plaintiff's food was contaminated.

Accordingly, the objective prong for an Eighth Amendment violation based on the provision of a food tray that did not comply with Plaintiff's therapeutic diet has been established and the court next addresses whether the subjective element has been met.

### 3.    Subjective Element

With the objective prong being met, the court next addresses whether Defendant Correction Officers, if it is determined they failed to report any complaints made by Plaintiff about receiving food items that did not comply with his therapeutic diet to the hall captain or mess hall, also were deliberately indifferent to the danger such failure to act caused. "Mere negligence or inadvertent failure to provide a medically necessary diet is not a constitutional violation, however. 'Deliberate indifference' must be demonstrated by proof that corrections personnel intentionally denied, delayed access

to, or interfered with the prescribed treatment."[34] *Abdush-Shahid*, 933 F.Supp. at 180 (citing *Estelle,* 429 U.S. at 104–05).  Summary judgment is not available where there is evidence in the record from which a reasonable trier of fact could conclude that Defendant Correction Officers knew that Plaintiff's consumption of food to which he was allergic posed a sufficiently serious threat to Plaintiff's health, yet failed to act on Plaintiff's complaints that he received food trays containing food items that were inconsistent with Plaintiff's therapeutic diet.

In particular, at their respective deposition, Defendant Correction Officers each testified that because they are not in the medical field, they were unaware that an injection of epinephrine was used to treat Plaintiff's January 8, 2017 anaphylactic shock episode that occurred after Plaintiff consumed wheat or gluten.  Crane Dep. Tr. at 51-52; Norton Dep. Tr. at 45-48; Rapini Dep. Tr. at 45-48.  Despite writing the IMR charging Plaintiff with refusing to return his food tray and other dining items on January 11, 2017, Crane maintains that not only did he not attempt to seek a replacement tray for Plaintiff, but also that he was unaware that Plaintiff wanted to retain the food tray to show his mental health counselor he was receiving food items that contained his allergens.  Crane Dep. Tr. at 67-68.  A careful review of their respective deposition testimony indicates Defendant Correction Officers do not specifically deny that Plaintiff never complained about receiving food items he was not able to consume but, rather, equivocally stated an inability to recall whether Plaintiff ever made such complaints. *See* Crane Declaration ¶ 25 ("I do not recall Plaintiff ever reporting any issues to me of

---

[34] The context of *Abdush-Shahid* establishes the "prescribed treatment" refers to the plaintiff's inmate's medically prescribed diet which was necessary to avoid a deleterious effect to the plaintiff's health specifically, a soft-food diet to avoid complications stemming from a growth in the plaintiff's salivary gland. *See Abdush-Shahid*, 933 F.Supp. at 172, 180.

his feed up tray."); Norton Declaration ¶ 26 (same); Rapini Declaration ¶ 24 (same);
Crane Dep. Tr. at 39 (there was never an issue with the meal Plaintiff received), 55-56
(Crane did not recall Plaintiff or any other inmate on special diet reporting being served
an inappropriate meal); Norton Dep. Tr. at 53 (Norton recalled Plaintiff was "always
complaining" but could not recall the specifics of Plaintiff's complaints).  *See* Rapini
Dep. Tr. at 36 (Rapini could not recall if Plaintiff ever reported receiving an incorrect
meal).  *See also* Crane Declaration ¶¶ 29-31 (Crane recalled filing an inmate
misbehavior report when Plaintiff refused to return his food tray and all utensils, but
could not recall the reason Plaintiff provided for refusing to return the items).

Further, each of the Defendant Correction Officers also stated that had Plaintiff
made such complaint, Plaintiff's complaint would have been immediately reported to the
hall captain, the mess hall, or the FSA.  Crane Declaration ¶¶ 26-27 (would contact the
hall captain or call the mess hall); Crane Deposition Tr. at 38-39 (if an inmate received
the wrong meal, the inmate would tell the C.O. who would alert either the hall captain or
the mess hall); Norton Declaration ¶¶ 27-29 (would advise the hall captain); Norton Dep.
Tr. at 63 (if an inmate on a special diet complained about a food tray, the inmate would
alert the correction officer who would advise the hall captain who would call the mess
hall and arrange for a replacement tray); Rapini Declaration ¶¶ 26-27 (would call the
FSA).  *See also* Crane Declaration ¶ 32 ("if Plaintiff wanted to show a supervisory
official incorrect food items, he could have keep [*sic*] the food items and returned [*sic* ]
the [food tray and associated] items").  Significantly, Defendant Correction Officers'
repeatedly answering questions by asserting they were unable to recall, rather than
directly denying specific questions aimed at determining whether these Defendants

were deliberately indifferent to the risk based on their awareness of the risk to Plaintiff's health posed by Plaintiff's consuming foods containing or contaminated by the allergens can be construed as circumstantial evidence sufficient to establish liability against Defendant Correction Officers. *See Donoghue v. Oaktree Specialty Lending Corp.*, 2024 WL 3455292, at * 11 (S.D.N.Y. June 20, 2024) (defendant's inability at deposition to recall salient aspects of a critical conversation was sufficient to establish material issue of fact as to defendant's credibility and supported denying defendant's motion for summary judgment); *Dukes Bridge, LLC v. Security Life of Denver Ins. Co.*, 2020 WL 1908557, at * 64 (E.D.N.Y. Apr. 17, 2020) (defendant's repeatedly answering "I don't recall" led judge, at bench trial, to discredit defendant's testimony as untruthful); *See also Upson v. Wilson*, 2025 WL 547455, at *2 (2d Cir. Feb. 19, 2025) ("'Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" (quoting *Farmer*, 511 U.S. at 842)).

The assertions by Defendant Correction Officers that they would have immediately reported any complaints Plaintiff made regarding his food also evade the issue whether Defendant Correction Officers understood that eating the wrong food posed a danger to Plaintiff yet were deliberately indifferent to such danger by failing to take steps to mitigate the danger posed by Plaintiff's receipt and likely consumption of a food tray that did not comply with Plaintiff's therapeutic diet, leaving Plaintiff with an Hobson's choice to either eat the food and suffer an allergic reaction, or go without food. *See Evans v. Albany County Correctional Facility*, 2009 WL 1401645, at * 9-10

(N.D.N.Y. May 14, 2009) (deliberate indifference requires the inmate plaintiff inform the correctional facility's staff that he was not served his medically prescribed diet and the defendants failed to take corrective measures (citing *Labounty*, 1998 WL 214774, at * 2 (granting summary judgment in favor of defendants where the inmate plaintiff's complaints to prison officials about food pertained only to the quality and preparation of the food and not that the prison failed to provide the plaintiff with his medically therapeutic diet)).  *See also Beckford v. Portuondo*, 151 F. Supp. 2d 204, 213 (N.D.N.Y. 2001) ("Substantial deprivation of nutritionally adequate food violates the Eighth Amendment if the food is served 'in a fashion that presents an immediate danger to the inmate's health or well-being [because the food did not comply with the inmate's dietary restriction].'" (quoting *Chapdelaine,* 1998 WL 357350, at *11).

Additional inconsistent statements by Defendant Correction Officers create more questions of fact regarding whether Defendant Correction Officers were deliberately indifferent to the danger that a meal containing allergens posed to Plaintiff.  For example, Rapini, despite averring that he would contact the FSA if an SHU inmate reported receiving an incorrect meal, Rapini Declaration at 28, at his deposition, Rapini was unable to explain what steps were taken to remedy the situation when a special diet inmate reported an issue with a meal.  *See* Rapini Dep. Tr. at 37-39 (describing the process by which an inmate is approved to receive a therapeutic diet, but denying any recollection of how meal issues reported by SHU inmates were to be handled).  Norton also inconsistently avers that he does not "personally recall" if Plaintiff was housed in Norton's company, Norton Declaration ¶ 29, yet also avers he did not tell Plaintiff that the pizza was gluten free, *id*. ¶ 30, recalled at his deposition that while assigned to

SHU, Plaintiff was always complaining, Norton Dep. Tr. at 53, and did not recall Plaintiff ever receiving medical care while Norton was working in SHU, *id*. at 43-44, or having an allergic reaction, *id*. at 62, despite also repeatedly acknowledging Plaintiff's January 8, 2017 episode of anaphylactic shock occurred during Norton's shift in SHU, *id*. at 42-43, 48, all suggesting Norton had an indifferent, if not cavalier, attitude toward Plaintiff's food allergies.

Accordingly, there are issues of fact and credibility regarding the subjective element of deliberate indifference precluding summary judgment in favor of either Plaintiff or Defendants as against Defendant Correction Officers.

**B.    Qualified Immunity**

Alternatively, Defendants argue they are qualifiedly immune from liability on Plaintiff's Eighth Amendment deliberate indifference claim because the record establishes Defendants acted reasonably to assist Plaintiff with his food trays when they contained food items that were not in compliance with Plaintiff's therapeutic diet. Defendants' Memorandum at 14-16.  In opposition, Plaintiff argues that where there exists an issue of fact as to whether a prison official acted with the requisite culpable state of mind, a finding of qualified immunity is premature on summary judgment. Plaintiff's Response at 15-16.  Defendants have not argued in further support of summary judgment on their alternative qualified immunity assertion.

Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  Even if the rights in question

are clearly established, a government actor may still be shielded by qualified immunity if "it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir. 1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir. 1990).

When analyzing a claim of qualified immunity, the court first inquires whether the facts, taken in the light most favorable to the party asserting the injury, demonstrate a violation of a constitutional right occurred. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Government officials performing discretionary functions generally are shielded by qualified immunity from liability in their individual capacities, *see Frank v. Reilin*, 1 F.3d 1317, 1327 (2d Cir. 1993), "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "If it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 568-69 (2d Cir. 1996).

Here, assuming, *arguendo*, Plaintiff's Eighth Amendment deliberate indifference claim survives Defendants' arguments for summary judgment, then Defendants are not entitled to qualified immunity on the claim because it was clearly established by November 30, 2016, when Plaintiff first received an incorrect food tray despite being prescribed a therapeutic diet that the failure to correct such error violated the inmate's Eighth Amendment right. *See Robles,* 725 F.2d at 15 ("[T]he Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served

'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.'" (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1990), *cert. denied*, 450 U.S. 1041 (1981))).  Defendants' motion for summary judgment thus should be DENIED with regard to the assertion of qualified immunity.

## **CONCLUSION**

Based on the foregoing, Plaintiff's motion (Dkt. 87) should be DENIED; Defendants' motion (Dkt. 88) should be GRANTED as to FSA Defendants Beecroft and Conners, as well as Defendant Noeth, and DENIED with respect to Defendant Correction Officers Crane, Norton, and Rapini.  The case should be scheduled for trial against Defendants Crane, Norton, and Rapini.

Respectfully submitted,

*/s/ Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:    May 22, 2025
          Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.


/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:      May 22, 2025
            Buffalo, New York